IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

JENNIFER GARNER, §
§
            Plaintiff, §
§
VS. § CIVIL ACTION H-10-138
§
CHEVRON PHILLIPS CHEMICAL §
COMPANY, L.P., and CHEVRON §
PHILLIPS CHEMICAL HOLDINGS II, §
L.L.C., GENERAL PARTNERS, §
§
            Defendants. §

## OPINION AND ORDER OF PARTIAL SUMMARY JUDGMENT

Pending before the Court in the above referenced cause, alleging violations of Plaintiff Jennifer Garner's ("Garner's") rights under the Family and Medical Leave Act of 1992 ("FMLA"), 29 U.S.C. §§ 2601-54, the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. §§ 12101-13, as amended by the ADA Amendments Act of 2008 ("ADAAA"), Pub. L. No. 110-325, 122 Stat. 3553, and the Fair Labor Standards Act of 1938 ("FLSA"), 29 U.S.C. §§ 201 *et seq.*, is Chevron Phillips Chemical Company, L.L.P. and Chevron Phillips Chemical holdings II, LLC, General Partners' (collectively, "Chevron's") motion for summary judgment (instrument #17).

Also pending is Garner's opposed motion for leave to file surreply (#32). Chevron contends the Court should deny the motion

-1-

because it simply rehashes previous points, fails to offer new evidence or information, and merely seeks to have the last word while delaying resolution of the motion for summary judgment. If the Court permits Garner to file the surreply, Chevron asks leave to file a final reply as it is customary and appropriate for a movant to have the final word.

The Court finds this argument meritless. The surreply in no way prejudices Chevron and does not affect the Court's determinations regarding the motion for summary judgment. It does provide documentary evidence in support of, but not a new argument about, Garner's claim of reduction of the percentage of Garner's merit pay increase in 2007 from earlier years. The Court accordingly grants the motion to file surreply, in the interests of time denies Chevron's request to file yet another reply, and accordingly addresses the motion for summary judgment.

## Standard of Review

Summary judgment under Federal Rule of Civil Procedure 56(c) is appropriate when, viewing the evidence in the light most favorable to the nonmovant, the court determines that "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." A dispute of material fact is "genuine" if the evidence would allow a reasonable jury to

find in favor of the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Initially the movant bears the burden of identifying those portions of the pleadings and discovery in the record that it finds demonstrate the absence of a genuine issue of material fact; the movant may, but is not required to, negate elements of the nonmovant's case to prevail on summary judgment. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Lujan v. National Wildlife Federation*, 497 U.S. 871, 885 (1990); *Edwards v. Your Credit, Inc.*, 148 F.3d 427, 431 (5th Cir. 1998).

If the movant meets its burden and points out an absence of evidence to prove an essential element of the nonmovant's case on which the nonmovant bears the burden of proof at trial, the nonmovant must then present competent summary judgment evidence to support the essential elements of its claim and to demonstrate that there is a genuine issue of material fact for trial. *National Ass'n of Gov't Employees v. City Pub. Serv. Board*, 40 F.3d 698, 712 (5th Cir. 1994).  "[A] complete failure of proof concerning an essential element of the nonmoving party's case renders all other facts immaterial." *Celotex*, 477 U.S. at 323.  The nonmovant may not rely merely on allegations, denials in a pleading or unsubstantiated assertions that a fact issue exists, but must set forth specific facts showing the existence of a genuine issue of material fact concerning every element of its cause of action(s). *Morris v. Covan World Wide Moving, Inc,*, 144 F.3d 377, 380 (5th Cir.

1998).   Conclusory allegations unsupported by evidence will not preclude summary judgment.  *National Ass'n of Gov't Employees v. City Pub. Serv. Board*, 40 F.3d at 713; *Eason v. Thaler*, 73 F.3d 1322, 1325 (5th Cir. 1996).

"'[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment . . . .'"  *State Farm Life Ins. Co. v. Gutterman*, 896 F.2d 116, 118 (5th Cir. 1990), *quoting Anderson v. Liberty Lobby, Inc.*. 477 U.S. 242, 247-48 (1986).  "Nor is the 'mere scintilla of evidence' sufficient; 'there must be evidence on which the jury could reasonably find for the plaintiff.'"  *Id., quoting Liberty Lobby*, 477 U.S. at 252.  The Fifth Circuit requires the nonmovant to submit "'significant probative evidence.'"  *Id., quoting In re Municipal Bond Reporting Antitrust Litig.*, 672 F.2d 436, 440 (5th Cir. 1978), and *citing Fischbach & Moore, Inc. v. Cajun Electric Power Co-Op.*, 799 F.2d 194, 197 (5th Cir. 1986). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."  *Thomas v. Barton Lodge II, Ltd.*, 174 F.3d 636, 644 (5th Cir. 1999), *citing Celotex*, 477 U.S. at 322, and *Liberty Lobby*, 477 U.S. at 249-50.

The court must consider all evidence and draw all inferences from the factual record in the light most favorable to the nonmovant.  *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986); *National Ass'n of Gov't Employees v. City Pub.*

-4-

*Serv. Board*, 40 F.3d at 712-13.

**Relevant Law**

**A.   ADA and ADAAA**

The ADAAA, P.L. 110-325, which amends the ADA, became effective on January 1, 2009 and expands the coverage of the ADA, but is not retroactive. *Kemp v. Holder*, 610 F.3d 231, 236 (5th Cir. 2010), *citing Carmona v. Southwest Airlines*, 604 F.3d 848, 857 (5th Cir. 2010), *citing EEOC v. Agro Distribution, LLC*, 555 F.3d 462, 469 n.8 (5th Cir. 2009).  Thus the ADAAA applies to Garner's claims in 2009, but only the ADA applies to her 2007 claims.

**1.   The ADA**

Title I of the ADA prohibits discrimination against an employee on the basis of physical or mental disability, requires an employer to make reasonable accommodations necessary to allow an employee with a disability to perform the essential functions of her job unless the accommodation would impose an undue hardship on the employer.  Section 12112(a) of the ADA provides that no covered entity shall "discriminate" against a qualified individual with a disability because of the disability of such an individual in regard to, *inter alia*, "the hiring, advancement, or discharge of employees . . . and other terms, conditions, and privileges of employment."  In addition, Section 12112(b)(5) states that the term, "discriminate," includes "not making reasonable accommodations to the known physical or mental limitations of an

-5-

otherwise qualified individual with a disability . . . unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operations of the business of such covered entity." A "qualified individual with a disability" is defined as "an individual with a disability  who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires.   42 U.S.C. § 12111(8). A disability is "(A) a physical or mental impairment that substantially limits one or more of the major activities of such individual; (B) a record of such impairment; or (C) being regarded as having such an impairment."[1] *See Sutton v. United Airlines, Inc.*, 527 U.S. 471 (1999) and *Toyota Motor Manufacturing v. Williams*, 534 U.S. 184 (2002), both of which were overturned by the ADAAA. *Sutton*, holding that an employee is not disabled if his impairment is corrected by a mitigating measure to

---

[1] Courts look to two possible authorities for interpreting the terms of § 12101:  the regulations interpreting the Rehabilitation Act of 1973, 87 Stat. 361, as amended, 29 U.S.C. § 706(8)(B)(1988), and the EEOC regulations construing the ADA. *EEOC v. Chevron Phillips Chemical Co., LP*, 570 F.3d 606, 614 n.4 (5th Cir. 2009), *citing Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184, 193 (2002).  The Rehabilitation Act, which prohibits discrimination based on disability by recipients of federal funds, is a precursor to the ADA on which Congress relied in drafting the ADA and about which Congress specified, "Except as otherwise provided in this chapter, nothing in this chapter shall be construed to apply a lesser standard than the standards applied under Title V of The Rehabilitation Act of 1973 (29 U.S.C. §§ 790 *et seq.*) or the regulations issued by Federal agencies pursuant to such title."  *Chevron Phillips*, 570 F.3d at 614 n.5.

the point where it does not substantially limit a major life activity (e.g., by insulin given to a diabetic), required a court to take into account the ameliorative effects of mitigating measures in determining whether there was a disability,[2] while *Toyota* narrowly construed and strictly interpreted the term "disability."[3]

To state a claim under subsection A, a plaintiff must allege that she has a physical or mental impairment.  § 12102(2)(A); 29 C.F.R. § 1630.2(g).  A "physical impairment" is "any physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: neurological; musculoskeletal; special sense organs; respiratory, including speech organs; cardiovascular; reproductive, digestive, genito-urinary; hemic and lymphatic, skin; and endocrine."  29 C.F.R. § 1630.2(h)(1).

―――――――――――――――

[2] In *Sutton*, 527 U.S. at 482, the Supreme Court opined, "[I]f a person taking measures to correct for, or mitigate, a physical or mental impairment, the effects of those measures--both positive and negative--must be taken into account when judging whether that person is 'substantially limited' in a major life activity and thus 'disabled' under the [ADA]."

[3] In *Toyota* the Supreme Court held that "major life activities" include "activities that are of central importance to daily life," and they are "substantially limited" when the impairment "prevents or severely restricts the individual from doing activities that are of central importance to most people's daily lives."  The limitation had to "be permanent or long-term." 534 U.S. at 198, citing 29 C.F.R. § 1630.2(j).  Moreover "substantially limits" must be construed "strictly to create a demanding standard for qualifying as disabled."  *Id.* at 197.

Simply having an impairment is insufficient to make one disabled under the statute; a plaintiff must also show that the impairment substantially limits a major life activity. *Chevron Phillips,* 570 F.3d at 614, *citing Toyota Motor*, 534 U.S. 184, 195 (2002). The implementing regulations in § 1630.2(i) provides a non-exhaustive list of major life activities, which include "caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and walking." 29 C.F.R. § 1630.2(i); *id.* Moreover, "to be substantially limited means to be unable to perform a major life activity that the average person in the general population can perform or to be significantly restricted in the ability to perform it." *Id.*, *citing* 29 C.F.R. § 1630.2(j). In deciding whether a person is "substantially limited in a major life activity, the Equal Employment Opportunity Commission ("EEOC") advised that courts should consider: '(i) the nature and severity of the impairment, (ii) the duration or expected duration of the impairment; and (iii) the permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment.'" *Id.* at 614-15, *citing* 29 C.F.R. § 1630.2(j). "[W]hether an individual is disabled under the ADA . . . remains an individualized inquiry." *Id.* at 620.

A covered employer must provide reasonable accommodations to an otherwise qualified person with a disability unless the employer can show that the accommodation "would impose an undue hardship" on

the employer.  42 U.S.C. § 12112(b)(5)(A).  The plaintiff bears the burden of requesting reasonable accommodations.  *Jenkins v. Cleco Power, LLC*, 487 F.3d 309, 315 (5th Cir. 2007).  "'The employee who needs an accommodation because of a disability has the responsibility of informing her employer.'"  *Rommel E. Griffin, Sr. v. United Parcel Service, Inc.*, ___ F.3d ___, No. 10-30854, 2011 WL 4978582 (5th Cir. Oct. 19, 2011)(page numbers not yet available), *quoting EEOC v. Chevron Phillips Chem. Co.*, 570 F.3d 606, 621 (5th Cir. 2009).  "'[W]here the disability, resulting limitations, and necessary reasonable accommodations are not open, obvious, and apparent to the employer, the initial burden rests primarily upon the employee . . . to specifically identify the disability and resulting limitations, and to suggest the reasonable accommodations.'"  *Id., citing id.*  If the employee does so, "'the employer and the employee should engage in a flexible, interactive discussion to determine the appropriate accommodation.'"  *Id., citing EEOC v. Agro Distrib.*, 555 F.3d 462, 471 (5th Cir. 2009).  While the employee has a right to a reasonable accommodation, the right is not to his preferred accommodation.  *Id., citing id.*  "'The employee bears the burden of proving that an available position exists that he was qualified for and could, with reasonable accommodations, perform.'"  *Id., quoting Jenkins v. Cleco Power, LLC*, 487 F.3d 309, 315 (5th Cir. 2007).  "'A disabled employee has no right to a promotion, to choose what job to which

he will be assigned, or to receive the same compensation as he received previously.'" *Id., quoting id.* at 316.  "'[W]hen an employer's unwillingness to engage in a good faith interactive process leads to a failure to reasonably accommodate an employee, the employer violates the ADA.'" *Id., quoting Loulseged v. Akzo Nobel, Inc.*, 178 F.3d 731, 736 (5th Cir. 1999).  "'[A]n employer cannot be found to have violated the ADA when responsibility for the breakdown of the 'informal interactive' process is traceable to the employee and not the employer.'" *Id., quoting id.*

2.  ADAAA

The ADAAA was enacted on September 25, 2008 and by its express language became effective on January 1, 2009, while the final regulations issued by the EEOC became effective on May 25, 2011.  76 Fed. Reg., 16978, 16999 (2011).  "The ADAAA is principally aimed at reversing Supreme Court precedent perceived as improperly narrowing the scope of protection originally intended by drafters of the ADA."  Louis P. DiLorenzo, *The Intersection of the FMLA and ADA--As Modified by NDAA, ADAAA and GINA*, 860 PLI/Lit 47, 83-84 (June 23, 2011); 29 C.F.R. § 1630.1(c)(4)("reinstating a broad scope of protection under the ADA"; "the definition of 'disability' shall be construed broadly in favor of expansive coverage to the maximum extent permitted by the terms of the ADA").  The EEOC emphasized that "the primary object of attention in cases . . . should be whether the covered entities have complied with

-10-

their obligations and whether discrimination has occurred, not whether the individual meets the definition of disability." 29 C.F.R. § 1630.1(c)(4).

The ADAAA directs that "substantially limits" should not be as strictly construed as some courts have required in the past and should not require "extensive analysis." ADA Amendments Act of 2008, §2(b)(5), 122 Stat. 3553, 3558. The ADAAA has added "major bodily functions" (e.g., the immune system, normal cell growth, digestive, bowel, bladder, neurological, brain, respiratory, circulatory, endocrine, and reproductive functions) to the ADA's list of major life activities, including caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, standing, sitting, reaching, lifting, bending, reading, concentrating, thinking, communicating, and working, while defining "physical or mental impairment" as any physiological disorder or condition, cosmetic disfigurement or anatomical loss affecting one or more body systems, as well as mental or psychological disorder. ADA Amendments Act of 2008, Pub. L. No. 110-325, Sec. 4, § 3(2)(A) and (B), 122 Stat. 3553, 3555.

Moreover, while retaining the basic definition of disability under the ADA ("a physical or mental impairment that substantially limits one or more major life activities"), "disability" now includes an impairment that is episodic or in remission if it would substantially limit a major life activity when active; examples

-11-

include epilepsy, hypertension, asthma, diabetes, major depression, bipolar disorder, schizophrenia, and cancer.  ADA Amendments Act of 2008, Sec. 4, § 3(4)(D), 122 Stat. 3553, 3555; 29 C.F.R. § 1630(j)(5).  An impairment lasting less than six months can be substantially limiting.  29 C.F.R. § 1630.2(j)(1)(ix).  An impairment that is in remission but may return in a substantially limiting form is a disability under the ADAAA.  29 C.F.R. § 1630.2(j)(1)(vii).  The ADAAA also amended *Toyota*'s definition of "major life activity" as "activities that are of central importance to most people's daily lives," instead indicating that the word "major" must "not be interpreted strictly to create a demanding standard for disability."  29 C.F.R. § 1630.2(i)(2).  Under the ADAAA, tasks involving major life activity of manual tasks, such as fine motor coordination, grasping, or pressuring, "need not constitute activities of central importance to most people's lives."  Appendix to Part 1630, *Interpretive Guidance on Title I of the Americans With Disabilities Act* § 1630.2(i); 76 Fed. Reg. at 17008.  To be "substantially limiting" an impairment does not have to prevent or significantly restrict a person from performing a major life activity.  *Id.*

Mitigating measures (such as medications, medical devices and assistive technology) are ignored when assessing whether an impairment substantially limits a person's major life activities.  ADA Amendments Act of 2008, Sec. 4 § 3(4)(E)(1), 122 Stat. 3553,

3556.  Moreover, the court may consider the negative effects of a mitigating measure, e.g., effects of medication, in determining whether the individual is substantially limited in a major life activity.

Furthermore, individuals who are "regarded as disabled," but who do not actually have a disability, only need to show that they were subjected to an action prohibited by the statute, and no longer that the disability substantially limited them in a major life activity.   Employers need not provide reasonable accommodations to those employees only "regarded as" having a disability.   ADA Amendments Act of 2008, Sec. 6 § 501 (l)(h), 122 Stat. 3553, 3558.

3.   Evidentiary Framework

When only indirect or circumstantial evidence is available, a plaintiff alleging a violation of the ADA must meet the burden-shifting framework of *McDonnell Douglas*.[4]   *Chevron Phillips*, 570

---

[4] *McDonnell Douglass Corp. v. Green*, 411 U.S. 792 (1973)(first plaintiff creates a presumption of intentional discrimination by establishing a prima facie case; if he succeeds the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for its challenged employment decision; if the employer meets this burden, the plaintiff must show (a) that the employer's reason is not true, but a pretext for discrimination, or (b) the defendant's reason, though true, is only one reason for its conduct and that another factor is the plaintiff's protected characteristic (mixed motive alternative)). The last element, known as the mixed motive rule, was developed in Title VII cases, and the Fifth Circuit has recognized that "the ADA is part of the same broad remedial framework as . . . Title VII, and that all the anti-discrimination acts have been subjected to similar analysis" as to burden of proof.   *Miller v.*

-13-

F.3d at 615, citing *McInnis v. Alamo Community College Dist.*, 207
F.3d 276, 279 (5th Cir. 2000).  Thus the plaintiff must first make
a *prima facie* showing of discrimination under the ADA, i.e., that
(1) she is disabled, has a record of having a disability, or is
viewed as disabled; (2) she is qualified for her job; (3) she was
subjected to an adverse employment action on account of her
disability or the perception of her disability; and (4) she was
replaced by, or treated less favorably than, non-disabled
employees.  *Id.*  Then, if the plaintiff succeeds, the burden shifts
to the employer to articulate a legitimate, non-discriminatory
reason for its adverse employment action.  Once the employer has

---

*Public Storage Mgmt., Inc.*, 121 F.3d 215, 218 (5th Cir. 1997).
    The Fifth Circuit has not extended the mixed motive analysis
to FLSA retaliation claims, however. It has questioned whether
the Supreme Court's recent decision in *Gross v. FBL Financial
Services, Inc.*, 129 S. Ct. 2343, 2349 (2009)("Unlike Title VII,
the ADEA's text does not provide that a plaintiff may establish
discrimination by showing that age was simply a motivating
factor.") makes the mixed motive framework unavailable to
plaintiffs alleging discrimination outside of Title VII.  *Wilson
v. Noble Drilling Services, Inc.*, No. 10-20129, 405 Fed. Appx.
909, 912 (5th Cir. Dec. 23, 2010)(based on distinct statutory
texts, holding that motivating factor test does not apply to ADEA
while Title VII explicitly authorizes such an approach).  The
Fifth Circuit has rejected applying *Gross* to Title VII
retaliation cases and permits mixed motive analysis for such.
*Smith v. Xerox*, 602 F.3d 320, 328-31 (5th Cir. 2010).  Although
the Fifth Circuit previously applied the mixed motive framework
to FMLA cases, it questions whether *Gross* now bars such, but it
has not yet decided.  *Wilson*, 405 Fed. Appx. at 912 n.1, *citing
Richardson v. Monitronics Int'l. Inc.*, 434 F.3d 327, 333 (5th
Cir. 2005).  District courts within the Circuit have applied the
mixed motive analysis to retaliation claims under the FMLA. *See,
e.g., Harville v. Texas A&M University*, Civ. A. No. H-10-1656,
2011 WL 2295279, *8 (S.D. Tex. June 8, 2011).

done so, the presumption of discrimination dissolves, and "the issue becomes discrimination *vel non*." *Id., citing Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 142 (2000). The plaintiff must show either that the employer's reason is not true, i.e. pretextual, or that the defendant's reason while true, is only one reason for its conduct and another motivating factor is the plaintiff's protected characteristic, under the ADA his disability. *Rachid v. Jack in the Box, Inc.*, 376 F.3d 305, 312 (5th Cir. 2004). The trier of fact can consider any evidence presented in the *prima facie* case and any other evidence the plaintiff presents to show that the employer's articulated reason for the adverse employment action was pretextual. *Id.*

A claim of unlawful retaliation under the ADA, as under Title VII, requires a plaintiff to make a *prima facie* case by showing that (1) he or she engaged in an activity protected by the ADA, (2) he or she suffered an adverse employment action, and (3) there is a causal connection between the protected act and the adverse action. *Seaman v. CSPH*, 179 F.3d 297, 301 (5th Cir. 1999), *cited for that proposition in Tabatchnik v. Continental Airlines*, 262 Fed. Appx. 674, 676 (5th Cir. Jan. 30, 2008). If the plaintiff succeeds, the employer must present a legitimate, non-discriminatory reason for the retaliatory adverse employment action. *Seaman*, 179 F.3d at 301. If the employer succeeds, the plaintiff must present sufficient evidence showing that the

employer's proffered reason is a pretext for discrimination and the plaintiff must show that but for the protected activity, the adverse action would not have occurred.   *Id.*

     With regard to retaliation claims, the Fifth Circuit has ruled that "[c]lose timing between an employee's protected activity and an adverse action against him may provide the 'causal connection' required to make out a prima facie case of retaliation." *Dooley v. Parks and Recreation for Parish of East Baton* Rouge, No. 10-31254, 2011 WL 2938080, *3 (5th Cir. July 22, 2011), *citing Swanson v. Gen. Servs. Admin.*, 110 F.3d 1180, 1188 (5th Cir. 1997), *citing Armstrong v. City of Dallas*, 997 F.2d 62, 67 (5th Cir. 1993).  "[T]he mere fact that some adverse action is taken *after* an employee engages in some protected activity will not *always* be enough for a *prima facie* case." *Roberson v. Alltel Info, Servs.*, 373 F.3d 647, 655 (5th Cir. 2004)(*quoting Swanson*, 110 F.3d at 1188 n.3).  "However, once the employer offers a legitimate, nondiscriminatory reason that explains both the adverse action and the timing, the plaintiff must offer some evidence from which the jury may infer that retaliation was the real motive." *Id., citing id*. and *Roberson v. Alltel Info. Servs.*, 373 F.3d 647, 656 (5th Cir. 2004)("Without more than timing allegations, and based on Alltel's legitimate, nondiscriminatory reason in this case, summary judgment in favor of Alltel was proper.").

     For a retaliation claim under the ADA, unlike under Title VII,

-16-

there is no requirement that the plaintiff suffer from an actual disability; the plaintiff need only demonstrate that the plaintiff has a reasonable good faith belief that the statute has been violated. *Tabatchnik*, 262 Fed. Appx. at 676 & n.1 (failure to prove a disability does not preclude the plaintiff from pursuing a retaliation claim). Where an employee has a good faith belief that he is disabled or perceived as disabled, making a request for a reasonable accommodation under the ADA may constitute engaging in a protected activity. *Id., citing* 42 U.S.C. § 12112(b)(5)(A) (statute requires "making reasonable accommodations to known physical or mental limitations of an otherwise qualified individual with a disability who is . . . an employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity.").

**B.   FMLA**

The FMLA has two types of provisions; one provides substantive rights while the other type prohibits penalizing an employee for exercising those rights. *Hunt v. Rapides Healthcare System, LLC*, 277 F.3d 757, 763 (5th Cir. 2002).

In the first category, 29 U.S.C. § 2612(a)(1)(D) of the FMLA permits individuals who work for covered employers[5] to take

_____

[5] The FMLA applies to private-sector employers with fifty or more employees. 29 U.S.C. § 2611(4)(A)(i). To be eligible for FMLA leave, an employee must have worked for the covered employee

temporary leave, up to twelve weeks during any twelve-month period, for a "serious medical condition" that makes them "unable to perform the functions of [their] position."  A "serious medical condition" requires "either inpatient care in a medical care facility or continuing treatment by a health care provider." *Oswalt v. Sara Lee Corp.*, 74 F.3d 91, 92 (5th Cir. 1996), *citing* 29 U.S.C. § 2611(11); *McArdle v. Dell Products, L.P.*, 293 Fed. Appx. 331, 334 (5th Cir. Sept. 22, 2008)(The statute entitles eligible employees to twelve work-weeks of leave in a twelve-month period for a number of qualifying events, including a "health condition that makes the employee unable to perform the functions" of his job. ).  *See also* 29 C.F.R. § 825.113 ("Serious health condition). If medically necessary, the employee may take leave intermittently. 29 U.S.C. § 2612(b)(1).   The Fifth Circuit requires a health condition that causes or threatens to cause "incapacitation" and makes absence from work "necessary"; a mild to moderate impairment, regardless of which the employee is still viewed as able to perform the functions of her job, is insufficient.  *Ford-Evans v. United Space Alliance LLC*, 329 Fed. Appx. 519, 528 (5th Cir. May 14, 2009), *citing Mauder v. Metropolitan Transit Authority of Harris County, Texas*, 446 F.3d 574, 581 (5th Cir. 2006), and *Murray v. Red Kap*

---

for at least 1250 hours during the last twelve months.  29 U.S.C. § 2611(2).  No one in the instant action disputes that Chevron is a covered employer and that Garner was eligible for FMLA leave. *Hunt*, 277 F.3d at 763.

*Inds., Inc.*, 124 F.3d 695, 698 (5th Cir. 1997).

Generally the employer must provide the returning employee with the same position he had or with "'an equivalent position with equivalent employment benefits, pay, and other terms and conditions of employment.'" *McArdle*, 293 Fed. Appx. at 334, *citing* 29 U.S.C. § 2614(a)(1).  If the employer fails to do so, the employee has right to bring an entitlement claim under 29 U.S.C. § 2615(a)(1). *Id., citing Haley v. Alliance Compressor LLC*, 391 F.3d 644, 649 (5th Cir. 2004).  The Fifth Circuit has opined about an entitlement claim,

> An equivalent position is "virtually identical to the employer's former position in terms of pay, benefits and working conditions, including privileges, prerequisites, and status."  29 C.F.R. § 825.215(a).  Upon return from leave, "[t]he employee must have the same or an equivalent opportunity for bonuses, profit-sharing and other similar discretionary and nondiscretionary payments."  *Id.,* § 825.215(e)(3); *see Smith v. E. Baton Rouge Parish Sch. Bd.*, 453 F.3d 650, 651 (5th Cir. 2006)(noting an equivalent position "must . . . have similar *opportunities* for promotion and salary increase."(emphasis added)).  *De minimis*, intangible changes in the employee's position do not however, violate the FMLA."  *Id.* (citing 29 C.F.R. § 825.215(f); *Mitchell v. Dutchmen Mfg.*, 389 F.3d 746 (7th Cir. 2004).

*McArdle*, 293 Fed. Appx. at 334-35.

An employer is prohibited from discriminating against employees who have taken FMLA leave, 29 U.S.C. § 2615(a)(1)-(2)[6];

---

[6] Section 2615(a) provides in relevant part,

(1) It shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter.

29 C.F.R. 825.220.  It is unlawful for an employer to interfere with, restrain or deny the exercise of or the attempt to exercise any right provided under the FMLA.  29 U.S.C. § 2615(a)(1). "Interference" is not defined in the statute, but Department of Labor regulations state, "Interfering with the exercise of an employee's rights would include, for example, not only refusing to authorize FMLA leave, but discouraging an employee from using such leave."  29 C.F.R. § 825.220.  To make a *prima facie* case for interference with a plaintiff's FMLA rights, a plaintiff must demonstrate that she was entitled to the benefit, i.e., that she suffered from a "serious medical condition that prevented her from working" so that her leave is protected under the statute, and that the benefit was denied.  *Ford-Evans v. United Space Alliance LLC*, 329 Fed. Appx. 519, 523 (5th Cir. May 14, 2009); 29 C.F.R. § 825.220(b); *Bocalbos v. National W. Life Ins. Co.*, 162 F.3d 379, 383 (5th Cir. 1998)(FMLA "protects employees from interference with their leave as well as against discrimination or retaliation for exercising their rights.").

--------

(2) It shall be unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter.

Section 2615(a)(2) prohibits discrimination or retaliation against an employee for exercising his rights under the statute. *Bell v. Dallas County*, No. 10-10317, 2011 WL 2672224, * (5th Cir. July 8, 2011), *citing Hunt v. Rapides Healthcare Sys., L.L.C.*, 277 F.3d 757, 763 (5th Cir. 2001).

A person who suffers an adverse employment action after seeking medical leave under FMLA may sue for retaliation by showing that (1) she engaged in an activity protected under the FMLA, (2) that she was subjected to a materially adverse employment action, and (3) a causal connection existed between the protected activity and the adverse employment action. *Hunt*, 277 F.3d at 768. *See alternatively Mauder*, 446 F.3d at 583 (To establish a *prima facie* case of retaliation under the FMLA, the plaintiff must demonstrate that (1) she was protected under the FMLA, (2) she suffered an adverse employment action, and (3) she was treated less favorably than an employee who had not requested leave *or* that the adverse decision was made because she sought protection under the FMLA.). *In accord, Wilson v, Noble Drilling Services, Inc.*, 405 Fed. Appx. 909, 912 (5th Cir. Dec. 23, 2010).  If the plaintiff succeeds, the burden of proof shifts to the employer to articulate a legitimate nonretaliatory reason for the employment decision. *Hunt*, 277 F.3d at 768.  "This burden is one of production, not persuasion; it can involve no credibility assessment." *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 142 (2000).  If the employer satisfies this requirement, the plaintiff must show by a preponderance of the evidence that the employer's reason is a pretext for retaliation. *Hunt*, 277 F.3d at 768.  "A plaintiff's prima facie case, combined with evidence that the employer's reason is false, may permit the trier of fact to conclude that the employer unlawfully [engaged in

retaliation]." *Reeves*, 530 U.S. at 148.

The court should consider temporal proximity between the FMLA leave and the termination in evaluating the causation element in the *prima facie* case only. *Grubb v. Southwest Airlines*, 296 Fed. Appx. 383, 390 (5th Cir. Oct. 10, 2008), *citing Mauder*, 446 F.3d at 583 (emphasizing temporal proximity in the *prima facie* context). The Fifth Circuit has found that the kind of temporal proximity that provides sufficient evidence of causality for a *prima facie* case must be "very close." *Strong v. Univ. Healthcare Sys., LLC*, 482 F.3d 802, 808 (5th Cir. 2007), *citing Clark County School Dist. v. Breeden*, 532 U.S. 268, 273 (2001); *see also Everett v. Central Miss., Inc. Head Start Program*, 2011 WL 4716317, *7 & n.31 (5th Cir. Oct. 5, 2011)(noting that three- and four-month periods have been found to be insufficient to establish *prima facie* evidence of causation). The plaintiff does not have to show that the protected activity was the only reason for his termination. *Id.*

**FLSA**

The FLSA mandates that employers pay overtime compensation for nonexempt employees.[7] *Rainey v. McWane, Inc.*, 314 Fed. Appx. 693,

---

[7] Section 207(a) does not apply to those "employed in bona fide executive, administrative, or professional capacity." *Rainey*, 314 Fed. Appx. at 694-5, citing 29 U.S.C. § 213(a)(1). Exemption is narrowly construed against the employer, and the employer bears the burden of demonstrating that an employee is exempt. *Tyler v. Union Oil Co. of Cal.*, 304 F.3d 379, 402 (5th Cir. 2002), *citing Dalheim v. KDFW-TV*, 918 F.2d 1220, 1224 (5th Cir. 1990). Whether an employee is exempt or not exempt under

694 (5th Cir. Mar. 12, 2009), citing 29 U.S.C. § 207(a).   The FLSA, 29 U.S.C. § 207(a)(1), generally requires an employer to pay employees who work more than forty hours per seven-day work week at a rate not less than one and one-half times the employee's regular rate.   *Allen v. Coil Tubing Servs., LLC,* Civ. A. No. H-08-3370, 2011 WL 4916003, *5 (S.D. Tex. Oct. 17, 2011); *Vela v. City of Houston*, 276 F.3d 659, 666 (5th Cir. 2001); *Thibodeaux v. Executive Jet Intern., Inc.*, 328 F.3d 742, 749 (5th Cir. 2003).   Under 29 U.S.C. § 216(b), an employer who violates the FLSA shall be liable for "unpaid overtime compensation . . . and in an additional equal amount as liquidated damages."   Moreover any person who repeatedly or willfully violates Section 206 or 207, relating to wages, shall be subject to a civil penalty not to exceed $1,100 for each such violation."   29 U.S.C. § 216(e)(2).[8]

---

FLSA is mainly a fact issue determined by his salary and duties and applications of the factors in 29 C.F.R. § 541.200(a), but the ultimate decision is a question of law.   *Lott v. Howard Wilson Chrysler-Plymouth, Inc.*, 203 F.3d 326, 330-31 (5th Cir. 2000); *McKee v. CBF Corp.*, 299 Fed. Appx. 426, 429 (5th Cir. Nov. 17, 2008).   For discussion of exemptions *see, e.g., Thibodeaux*, 328 F.3d 742; *Vela*, 276 F.3d 659.   There is no dispute in the instant case that Garner was a nonexempt employee.

  [8] Under FLSA, a violation is "willful" if the employer "'either knew or showed reckless disregard for . . . whether its conduct was prohibited by the statute.'"   *Singer v. City of Waco, Tex.*, 324 F.3d 813, 821 (5th Cir. 2002), *quoting Reich v, Bay, Inc.*, 23 F.3d 110, 117 (5th Cir. 1994), *quoting McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133 (1988).   The plaintiff bears the burden of demonstrating that the FLSA violation was willful. *Id.*

  Under 29 U.S.C. § 255(a), a cause of action for unpaid overtime under the statute "shall be forever barred unless

Thus an employer who violates the FLSA is liable for liquidated damages equal to the unpaid overtime unless the court finds that the employer acted in good faith and had reasonable grounds to believe that his actions complied with the statute and therefore declines to award or reduces the amount of the liquidated damages. *Stokes v. BWXT Pantex, LLC*, 424 Fed. Appx. 324, 326 (5th Cir. May 4, 2011), citing 29 U.S.C. § 260. The employer bears the burden of demonstrating that it acted in good faith to escape mandatory liquidated damages under the statute. *Perez*, 2011 WL 2672431, at *9, *citing Singer v. City of Waco, Tex.*, 324 F.3d 813, 821 (5th Cir. 2003), and *Stokes v. BWXT Pantex, LLC*, 424 Fed. Appx. at 326.

Plaintiffs are only entitled to overtime compensation for tasks of which the employer had actual or constructive knowledge that the employee was working. *Newton v. City of Henderson*, 47 F.3d 746, 748 (5th Cir. 1995), *citing Davis v. Good Lion*, 792 F.2d 1274, 1276 (4th Cir. 1986); *Perez v. Guardian Equity management, LLC*, 2011 WL 2672431, *9 (S.D. Tex. July 7, 2011). Constructive knowledge exists if an employer "exercising reasonable diligence" would become aware that an employee is working overtime. *Von Friewalde v. Boeing Aerospace Operations, Inc.*, 339 Fed. Appx. 448,

---

commenced within two years after the cause of action accrued, except that a cause of action arising out of a willful violation may be commenced within three years after the cause of action accrued."

455 (5th Cir. 2009), *citing Brennan v. Gen Motors Acceptance Corp.*, 482 F.2d 825, 827 (5th Cir. 1973).  "'An employer who is armed with [knowledge that an employee is working overtime] cannot stand idly by and allow an employee to perform overtime work without proper compensation, even if the employee does not make a claim for overtime compensation.'"  *Newton*, 47 F.3d at 748 (If an employer knows its employee worked overtime, it must pay overtime wages "even if the employee does not make a claim for overtime compensation."), *quoting Forrester v. Roth's I.G.A. Foodliner, Inc.*, 6346 F.2d 413, 414 (9th Cir. 1981), and 29 C.F.R. § 785.15 ("Work not requested but suffered or permitted is work time."[9]). Under 29 C.F.R. § 785.13, "[i]n all such cases it is the duty of the  management to exercise its control and see that the work is not performed if it does not want it to be performed.  It cannot sit back and accept benefits without compensating for them."  *See also Prince v. MND Hospitality, Inc.*, Civ. A. No. H-08-2617, 2009 WL 2170042, *7 (S.D. Tex. July 20, 2009); *in accord, Reich v. Dept. of Conservation and Natural Res., State of Ala.*, 28 F.3d 1076 (11th Cir. 1994).

The employer bears the burden of exercising its control to ensure that overtime work is not performed if it is prohibited by the employer.  29 C.F.R. § 785.13.  *Reich v. Steward*, 121 F.3d 400,

---

[9]  Title 29 U.S.C. § 203 defines "employ" as including "to suffer or permit to work."

407 (8th Cir. 1997)("The employer who wishes no such work to be done has a duty to see it is not performed. . . . If the employer has the power and desire to prevent such work, he [or she] must make every effort to do so.").  Furthermore "[a]n announcement by an employer that no overtime work will be permitted, or that overtime work will not be compensated unless authorized in advance, will not impair the employee's right to compensation for work he is actually suffered or permitted to perform."  29 C.F.R. § 778.316.  "In all such cases it is the duty of management to exercise its control and see that the work is not performed if it does not want it to be performed.  It cannot sit back and accept the benefits without compensating for them  The mere promulgation of a rule against such work is not enough.  Management has the power to enforce the rule and must make every effort to do so."  29 C.F.R. § 785.13.

Nevertheless, the plaintiff must show that the employer had actual or constructive knowledge that he was working overtime.  If an employee fails to notify the employer or deliberately prevents the employer from gaining knowledge of his overtime work, the employer's failure to pay overtime does not violate § 207.  *Von Friewalde*, 339 Fed. Appx. at 455*, citing Forrester*, in which the appellate court affirmed the district court's grant of summary judgment for the employer because the employee turned in time sheets that did not include the overtime hours and the employee did not demonstrate that the employer should have known about the

overtime hours.   In *Newton*, the court found that the employer could not have constructive knowledge of overtime when the employee never complained about or reported working overtime hours.   *Id., citing Newton*, 47 F.3d at 748.   In *Newton* the City required employees to have overtime hours approved before the work, but the plaintiff never asked for pre-approval nor recorded overtime hours on his time sheet, and there was no evidence that showed that the employer knew or should have known it was violating the FLSA.   *Id.   See also discussion in Prince*, 2009 WL 2170042, *9.

Title 29 U.S.C. § 211(c) requires that the employer "make, keep and preserve such records of the persons employed by him and of the wages, hours, and other conditions of employment maintained by him." As summarized in *Lynch v. Jet Center of Dallas, LLC*, Civ. A. No. 3:05-CV-2229-L, 2007 WL 211101, *5 (N.D. Tex. Jan. 26, 2007),

> Under the FLSA, "an employee who brings suit for unpaid overtime compensation bears the burden of proving, with definite and certain evidence, that he performed work for which he was not properly compensated." *Reeves v. International Telephone & Telegraph Co.*, 616 F.2d 1342, 1351 (5th Cir. 1980), *cert. denied*, 449 U.S. 1077 . . . (1981), *implicit overruling on other grounds recognized in Heidtman v. County of El Paso*, 171 F.3d 1038, 1042 n.4 (5th Cir. 1999).   Where an employer keeps incomplete or [in]accurate records, however, "an employee has carried out his burden if he proves that he has in fact performed work for which he was improperly compensated and if he produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference." *In re Williams*, 298 F.3d 458, 465 (5th Cir. 2002)(*citing Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687-88 . . . (1946) [superseded in part by statute on other grounds by The Portal-to-Portal Act,

amending FLSA in 1947, 29 U.S.C. § 251, *et seq.*]. The burden then shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negate the reasonableness of the inference to be drawn from the employee's evidence. *Anderson*, 328 U.S. at 687-88. "If the employer fails to produce such evidence, the court may then award damages to the employee, even though the result be only approximate." *Id.* at 688.

As stated by the Supreme Court, "The remedial nature of this statute and the great public policy which it embodies . . . militate against making [the plaintiff's burden] an impossible hurdle for the employee." *Anderson*, 328 U.S. at 687. It is the employer's duty to keep records of the employee's wages, hours, and other conditions and practices of employment; the employer is in a superior position to know and produce most probative facts concerning the nature and amount of work performed and "[e]mployees seldom keep such records themselves." *Id.* Therefore if the employer fails to keep proper and accurate records and "the employee cannot offer convincing substitutes,"

[t]he solution is not to penalize the employee by denying him any recovery on the ground that he is unable to prove the precise extent of uncompensated work. Such a result would place a premium on an employer's failure to keep proper records in conformity with his statutory duty; it would allow the employer to keep the benefits of an employee's labors without paying due compensation as contemplated by the Fair Labor Standards Act. In such a situation we hold that an employee has carried out his burden if he proves that he has in fact performed work for which he was improperly compensated and if he produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference. The burden then shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negate the reasonableness

-28-

> of the inference to be drawn from the employee's
> evidence.   If the employer fails to produce such
> evidence, the court may then award damages to the
> employee, even though the result be only approximate.

*Id.* at 687-88.

"'It is . . . a fundamental precept of the FLSA that an employee should not be denied [recovery] because proof of the number of hours worked is inexact or not perfectly accurate.'"). *Perez*, 2011 WL 2672431, *9, *quoting Monroe v. FTS USA, LLC*, 763 F. Supp. 2d 979, 989 (W.D. Tenn. 2011).  "A plaintiff need not 'prove each hour of overtime with unerring accuracy or certainty.'" *Prince*, 2009 WL 2170042, *6.  "In the absence of rebuttal by defendants, plaintiffs' recollection and estimates of hours worked are presumed to be correct."  *Id., quoting Ting Yao Lin v. Hayashi Ya II, Inc.*, No. 08-CV-6071, 2009 WL 289653, *3 (S.D.N.Y. Jan. 30, 2009)(finding plaintiffs' initial burden was satisfied by affidavits based on the plaintiffs' recollection describing the time spent performing various tasks for which they did not receive overtime compensation).  Evidence can include plaintiff's testimony as to when and how many overtime hours he worked, plaintiff's affidavit to such, etc.  *Prince*, 2009 WL 2170042, at *6.

The *McDonnell Douglas* evidentiary framework also applies to a claim of retaliation under the FLSA.  *Hagan v. Echostar Satellite, L.L.C.*, 529 F.3d 617, 624 (5th Cir. 2008).  The plaintiff must establish a *prima facie* case by demonstrating that he participated in a protected activity under the statute; (2) he suffered an

-29-

adverse employment action; and (3) a causal link existed between the activity and the adverse action. *Id.* If he succeeds, the employer must articulate a legitimate, nondiscriminatory reason for its decision. The burden then shifts to the plaintiff to show that the proffered reason is a pretext for discrimination. *Id.* The ultimate question is whether the employer took the adverse action against the plaintiff because of his protected status. *Id.*

Regarding an employee's protected status, which is based on engaging in a protected activity as defined by 29 U.S.C. § 215(a)(3), it is unlawful for the employer "to discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter, or has testified or is about to testify in any such proceeding, or has served or is about to serve on an industry committee." The Fifth Circuit recognized that an informal internal complaint can be a protected activity but it must be about a violation of the law; "not all abstract grumblings or vague expressions of discontent are actionable complaints." *Hagan*, 529 F.3d at 626. The Supreme Court, in considering its language "filed any complaint" as well as the purpose and context of the statute, recently held that the anti-retaliation provision protects both oral and written complaints of a violation of the FLSA. *Kasten v. Saint-Gobain Performance Plastics Corp.*, 131 S. Ct. 1325 (2011). The complaint

must also give fair notice to the employer: "To fall within the scope of the antiretaliation provision, a complaint must be sufficiently clear and detailed for a reasonable employer to understand it, in light of both content and context, as an assertion of rights protected by the statute and a call for their protection." *Id.* at 1335.

**Factual Allegations in First Amended Original Complaint (#14)**

Plaintiff was first employed by Chevron on June 1, 1989 as a Laboratory Technician in its Kingwood facility. In April 2007, she began experiencing symptoms, including extreme anxiety and stress, difficulty concentrating, short-term memory lapses, nausea, shaking, sweating, rapid heartbeat, shortness of breath, and hyperventilation, which caused her to be absent from work for several days each month. She sought treatment in July 2007. After providing Chevron with a request for medical leave from her treating physician, who thought Plaintiff was suffering from depression, she was absent from work for approximately four weeks in August 2007, for which she used twenty days of her accrued vacation paid time off and only seven accrued sick leave days. Garner claims that she generally worked in excess of forty hours per week despite her medical problems. Her condition was finally diagnosed in November 2008 as panic disorder and agoraphobia, and her medications were adjusted.

Her complaint states that she received a smaller raise in

March 2008 than in previous years.  She was told by John Wilkey ("Wilkey")[10] that she was not being penalized for her four-week absence, but that she was not getting a "good" raise[11] because she had not completed as much work in the eleven months that she worked as she would have had she worked the whole year.

In January and February 2009, Plaintiff presented Chevron with a directive from her treating physician identifying her diagnosis, associated symptoms, and medication change.

In May 2009, Wilkey investigated alleged policy violations by Garner.  Dr. Gyanesh Khare ("Khare"), a chemist who worked closely with Garner,[12] told Wilkey that Garner "was demonstrating lack of attention to detail and forgetfulness and this was not her typical behavior."  Garner told Wilkey that her prescribed medications could affect her job performance.  Wilkey required Garner to provide Chevron's nurse with a list of her prescribed medications.  Several days later Chevron's company physician, Dr. Cobham

---

[10] Chevron, with supporting deposition evidence, identifies Wilkey as Garner's immediate supervisor from the spring of 2006 until her termination.  #17 at 4.

[11] Pointing to Garner's deposition, #17, Ex. A at 73, Chevron states that Garner now admits that she received her usual raise for the year 2007.

[12] Chevron states that Khare, as the chemist for whom Garner performed experiments and to whom she reported the results, oversaw Garner's work product.  #17 at 4-5.  In her response (#28 at 4) to the motion for summary judgment, Garner identifies Khare as her supervisor and "a chemist who directed her work on experiments."

-32-

("Cobham"), advised that Garner "may continue to work with her current medications." Garner asserts that Chevron "arbitrarily and unilaterally" decided that she could work without restrictions and that no accommodations were required.

In a meeting on June 24, 2009 with Wilkey and "John" Abbott ("Abbott"),[13] Wilkey told Garner that she must make an appointment as soon as possible to be "evaluated by the Company doctor to see if she was fit to work" and until then, she was to do only desk work. Later that evening  Wilkey called Garner at home and told her that he was suspending her with pay instead. On June 26, 2009, after Garner submitted a directive from her treating physician stating that Garner was not able to work for an indefinite period for medical reasons, Garner requested, by facsimile to the human resources department and by email to Abbott, a short-term disability leave and/or medical leave under the FMLA. Garner was told on June 29, 2009 that she was fired, allegedly for violating Chevron's policy by forgetting to sign the sign-in sheet when she retrieved a book from her office on Saturday, June 20, 2009. Claiming that Abbott made the decision to fire her at least in part because she had requested short-term sick leave on June 26, 2009 (although she gave notice that she might take FMLA leave weeks

---

[13] The correct names are John Wilkey and Ronald Abbott. Chevron states that Dr. Ronald Abbott, the manager of Petrochemical Research & Development Research and Development Group, was Wilkey's supervisor beginning on January 1, 2009.  #17 at 5.

-33-

earlier), she charges that Chevron intentionally made the firing retroactive to June 24, 2009 to a date before she made the formal leave request.  Garner Dep., #28. Ex. C at 187.

Garner asserts that her physical and/or mental impairments substantially limited one or more major life activities, that she had a record of an impairment, that the Company regarded her as having an impairment, and that Wilkey and Abbott were aware of her disability, symptoms, and medications for purposes of the ADA.  She asserts that she was terminated because of her disability.  Garner further charges that Chevron violated the ADA in arbitrarily and unilaterally deciding that she was able to work without restrictions or accommodations and in terminating her employment because she was disabled and/or regarded as disabled.

Garner contends that Chevron violated the FLSA because Chevron willfully or with reckless disregard did not compensate her time-and-a-half when she regularly worked more than forty hours per week.

Plaintiff also claims that Chevron violated the FMLA by (1) failing to provide up to twelve weeks of unpaid leave when she was suffering from "a serious health condition" that made her "unable to perform the functions" of her job, under 29 U.S.C. § 2612(a)(1)(D); (2) failing to restore her to the same or a comparable position under 29 U.S.C. § 2614(a)(1); (3) interfering with, restraining or denying her exercise of her rights under the

-34-

statute, 29 U.S.C. § 2615(a)(1); and (4) retaliating against her
for exercising her rights under the statute, 29 U.S.C. § 2617(a).

### Chevron's Motion for Summary Judgment

Chevron moves for summary judgment on three grounds: (1)
Garner failed to meet her burden of production of evidence
sufficient to show that Chevron terminated her because of her
disability, and she has not and cannot rebut the overwhelming
evidence that Chevron terminated her because she committed repeated
security and safety violations; (2) Garner has not met her burden
to raise a genuine issue of material fact as to whether Chevron
interfered with her right to take FMLA leave or retaliated against
her for requesting leave because Chevron has established that the
decision to terminate her was made by Abbott before she requested
leave and because Abbott at that time did not know and had no
reason to know that Garner might request leave; and (3) Garner
failed to meet her burden of production of evidence sufficient to
raise a question of fact about whether she worked overtime hours
for which she was not compensated.

With supporting summary judgment evidence, Chevron states, as
its legitimate nondiscriminatory reason for her termination, that
in the year before her termination on June 24, 2009, among multiple
known violations by her of company policy, Garner violated
important company laboratory security and safety policies three
times. Before the last violation she was formally disciplined and

at her disciplinary meeting, she signed a written statement admitting her violations and acknowledging that any further violations would result in her termination. Chevron further contends that Garner never suffered an adverse employment action or penalty because of her 2007 FMLA leave, and that Abbott decided to fire Garner before she requested leave under the FMLA and without knowledge that Garner might request such leave. Chevron further asserts that Garner never reported to Chevron that she had worked overtime.

Chevron represents that Garner was a nonexempt employee working on a "9/80" schedule, i.e., she worked nine nine-hour days and one eight hour day, equaling eighty hours, each two-week pay period (40 hours per week), and had every other Friday off.[14] Wilkey testified during his deposition (Ex. C at 64-66) that he expected his nonexempt employees to obtain his approval before working overtime, and they would then be paid overtime or compensated with time off in the same pay week.

Chevron contends that Garner violated Chevron's purchasing policy in 2008 by using a company credit card to purchase safety glasses without prior approval. Garner Dep. at 92-94; Garner Dep. Ex. 5 (Ex. B to #17), p. 8, "Employee Final Comments." She was not disciplined, nor did the infraction negatively affect her

---

[14] Chevron cites to Garner's Dep. at 163, but that page is not included in #17, Ex. A.

evaluation.

In 2009 Garner obtained two notes from her treating physician, Dr. Lawrence Gilbert; the first, dated January 27, 2009 (Ex. F at p. 8), she gave to Wilkey, and the second, dated February 6, 2009 (Ex. F at 9), to Khare.   Ex. A, Garner's Dep. at 20-22.   In her deposition testimony she admitted that she did not tell either man that she had a medical condition nor did she ask for any sort of accommodations.   #17, Ex. A, Garner's Dep. at 18-20, 22, 27. Neither of the notes was ever shown to Abbott before Garner's termination.   Abbott Dep., Ex. E at 44-46.   The February 6, 2009 physician's note, stating that Garner had "no health issues which would prevent her from doing her job at her place of employment and doing it safely," was sent to and received by Chevron's Occupational Health Department ("Corporate Medical") on February 16, 2009.   Ex. C, Wilkey Dep. at 22-23; Ex. D, Abbott Dep. Ex. 1-1, Feb. 6, 2009 note from Red Oak Psychiatry Associates, and Ex. 1-2 p.3.

Chevron's Unattended Process Policy for security and safety reasons forbids security guards from performing any laboratory work.   Ex. A, Garner Dep. at 54-55, 139.   Chevron charges that Garner's first known policy violation in 2009, on February 23, was leaving a laboratory experiment running overnight in accordance with normal protocols.   Late that night a security guard on duty telephoned Garner at home to report an odor seeping into the

hallway from her laboratory.  Garner realized the odor came from an
accumulation of trimethylamine fumes from a calcination experiment
that were not being ventilated because the fume hood sashes were
closed.  She called Khare and then called the security guard on
duty and told him to enter the laboratory to open the fume hood
sashes.  Ex. A, Garner Dep. at 27-29.  In reaction to this
violation, on March 6, 2009 Abbott sent an email to *all* individuals
under his management, including Garner and Wilkey, that "the
guard's role is to report the nonroutine situation (s)he has
discovered.  Nothing more.  It is YOUR responsibility to secure the
lab. . . .  It is NEVER acceptable to ask the guard to handle this
on your behalf."  Ex. A, Garner Dep. at 36; Ex. C, Wilkey Dep. at
31; Ex. B, Ex. 1, Garner Dep. Ex. 6-1, email from Abbott to all
employees.  In addition Abbott gave a safety presentation at an
employee meeting.  Abbott Dep. at 60.  Garner admitted that she
received Abbott's e-mail and that she had violated a policy by her
conduct.  Garner Dep. at 36, 38, 128.  She was not formally
disciplined after this violation.  Abbott Dep. at 65.

On May 2, 2009, Garner violated the Unattended Process
Operations Policy.  On April 30, 2009 she accidentally left an
airflow valve open when she left work.  That night she called her
facility twice, asking for someone who could enter the laboratory
to turn off the valve; both times a security guard answered but
refused and told Garner that there were no employees available who

could do so without violating the policy.  Garner waited, and on the night of May 2, 2009,[15] again called the facility and reached a different security guard, who followed her instructions and closed off the valve.  Garner admits she should not have done so and that her actions were policy violations.  Garner Dep. at 41-42, 149.

Garner was formally disciplined on May 18, 2009, when she met with Wilkey and Human Resources Business Partner Patsy Love, was read a letter of reprimand, and signed it.  Garner Dep. at 120; Ex. B, Ex. 2, Signed Reprimand Letter of May 18, 2009.  The letter states that it is a "final warning.  Any future episodes of insubordination will result in termination of employment."  Ex. B, Ex. 2, Signed Reprimand Letter of May 18, 2009.  After Garner signed the letter, she was informed that she was being suspended for two days without pay and was sent home.  Ex. C, Wilkey Dep. at 36, 38.  Wilkey testified in his deposition that she never mentioned her medical condition during this meeting.  *Id.* at 38-40.

Chevron does point out that about a week before the May 18th meeting, Garner provided Corporate Medical with a list of medications that she was taking and told Corporate Medical that her

---

[15] Garner now argues that the third phone call was made on April 30, 2009.  Garner Dep. at 41; #28, Ex. C at 123-25, and Abbott Dep., *id.* at Ex. E at 61.  Her own previously signed statement is to the contrary and states that the third phone call took place on May 2.  Ex. B, Ex. 2, Signed Reprimand Letter of May 18, 2009.

anxiety was getting worse.  After Corporate Medical reviewed the list and the February 6th note from Garner's physician stating that Garner had "no health issues which would prevent her from doing her job at her place of employment and doing so safely," Corporate Medical told Wilkey that Garner was free to work without restrictions.  Ex. A, Garner Dep. at 55-56; Ex. C, Wilkey Dep. at 24, 40; Abbott Dep. Ex. 1-2, pp. 1-3, Clinic Visits Progress Notes Report.

Garner's third violation, this time of Chevron's Working Alone Policy, occurred on June 20, 2009.  Although Garner was not scheduled to work that Saturday, she came to the facility shortly before 11:00 a.m.  After trying to enter through a locked back door (because it was closest to her laboratory), she came in through the main lobby, where a security guard, Jason Holt, was sitting at the security counter.  Instead of signing in on the sign-in sheet, she held a pen over it in a way that she admits could look as if she was signing in.  She then went to her lab.  When leaving, she again held the pen over the sign-in sheet as if signing out.  After she left, the security guard checked the sign-in sheet and found that Garner had not signed in, as she was required to, so the guard signed her in to preserve a record of her appearance.  Ex. A, Garner Dep. at 44-49, 53; Ex. C, Wilkey Dep. at 41-42; Ex. E, Abbott Dep. at 76-80 and Ex. F at 28-29 (Chevron Phillips Chemical Co. Kingwood Working Alone Policy)(also Ex. B at 19-20).

On June 24, 2009 Wilkey and Abbott met with Garner as part of an official investigation of Garner's final policy violation. Wilkey Dep. at 41-42; Abbott Dep. at 78.  Garner stated to Abbott that she had memory problems, perhaps related to her medications, and Abbott referred her to Corporate Medical.  Chevron asserts that Garner did not inform Abbott that she had an appointment scheduled with her doctor on June 26, 2009 nor indicate that she might request medical leave.  Abbott Dep. at 81-82.  After hearing Garner's version of the sign-in event, Abbott asked Garner to return to her office and to not do any more safety-sensitive work until the investigation concluded.  That evening Abbott suspended Garner with pay for the duration of the investigation and told her not to come to work until the investigation was completed.

Chevron argues that Abbott and Wilkey both believed in good faith that Garner had purposely tried to deceive the security guard by faking her signing.  Wilkey Dep. at 47-48; Abbott Dep. at 79-80. That good faith belief entered into Abbott's decision to terminate Garner's employment.  Wilkey Dep. at 47-48; Abbott Dep. at 79-81.

Chevron claims that on the same evening of June 24, 2009, in consultation with superiors and with legal counsel, Abbott decided to terminate Garner for her repeated security and safety policy violations, and from that evening through June 26, 2009 went through the "lengthy" process required to terminate a long-time employee.  Abbott and Human Resources purportedly decided not to

inform Garner of her termination until the following Monday, June 29, 2009 and scheduled a phone call to her on that date.

Meanwhile, on June 26, 2009 Garner, while on suspension, saw Dr. Ginsberg and obtained from him a request for medical leave. Garner Dep. at 57-58.  At 3:25 p.m. that day she faxed the request to Corporate Medical, but not to Abbott, Wilkey or Human Resources. Garner Dep. at 58.  The Corporate Medical Nurse, Debbie Shoemaker ("Shoemaker"), was not in the office that day.  Shoemaker returned on Monday morning, June 29, 2009, received the faxed request, processed it, and forwarded it to Wilkey and others.  Ex. B, Ex. 8, at p. 29.  Chevron claims that because the decision to terminate Garner had already been made, Abbott proceeded with the scheduled phone call and terminated Garner by telephone on the evening of June 29, 2009.

### Plaintiff's Response (#28)

Garner attaches and references documentary evidence to support her claims.  The Court summarizes only matters not previously discussed.

Garner was the only employee assigned to work in her laboratory.  Each day after arriving, she typically logged into her computer and checked e-mails and voice-mails.  Garner Declaration, Ex. A to #28. She would then meet with Khare, review with him the results of the experiments she had completed the day before, and receive instructions for the new day's experiments.  *Id.*  She would

then return to the lab and begin work.   The timing of her activities depended on the nature of the experiments, some taking several hours.   *Id.* and Ex. C, Garner Dep.   Garner recorded her actions and observations during these experiments in a handwritten lab notebook.   Garner Decl.   After she finished her experiments, she cleaned the lab and the used equipment.   *Id.*   At the end of the day she often e-mailed Khare, then logged off the computer.   *Id.*

Chevron did not require her to report the hours she worked, to sign in or out of work on a time sheet, nor to keep track of the hours she worked each day.   *Id.,* #28, Wilkey Dep., Ex. D at 64; Abbott Dep., Ex. E at 115.   Employees did sign in and out of the building at the security desk only if they were arriving or departing after hours or on weekends intending to work.   Wilkey Dep. at 60-70; Abbott Dep. at 123; Garner Decl.; CPC 0307, Ex. B-1, Documents provided by Defendants.   Nevertheless, Garner's practice was to leave the building out of the back door at the end of the day as it was the exit closest to her lab.

After Garner was out for four weeks on FMLA leave in August 2007, in an email to another supervisor dated December 13, 2007 related to a performance appraisal proposal, Wilkey indicated he would rate Garner "downwardly mobile" and requested a conference relating to the impact of rating her "NI," or "Needs Improvement." Ex. B-1, CPC 0305.   In March 2008 he informed Garner during her 2007 performance appraisal that she was not going to get a "good"

-43-

raise because she had not completed as much work in eleven months as she would have had she worked the whole year.  #28, Ex. C, Garner Dep. at 73-81; Ex. B, CPC 0208 and CPC 0305.  Garner says that in addition to this evidence that Chevron was dissatisfied with her medical leave of absence in 2007, her Performance Management appraisal review for 2007 stated that her "quantity of work output has declined in the latter half of 2007.  While this is not a typical performance for [Garner] in order to be fully successful this year [2008] this trend needs to be reversed right away."  Ex. B-4, 000054, Final Comments, Supervisor Feedback.

Despite medical problems resulting in occasional absences from work, for which she usually used mostly accrued vacation days, Garner contends that she regularly worked in excess of forty hours per week.  Garner Decl.; CPC-0005-08; CPC 10-11.

Complying with Chevron polices (CPC 0335), in a document dated January 27, 2009 Garner provided Chevron, in particular Khare and Wilkey, with a directive from her treating physician describing her diagnoses and symptoms and indicating that her medications were being adjusted.  #28, Ex. C, Garner Dep. at 20-22; Abbott Dep. Ex. "1" to Ex. F Note from Dr. Ginsberg's office stating that Garner "is being treated for Major Depression, Panic Disorder and Social Phobia.  Her symptoms include mind racing, trouble sleeping, irritability, daily generalized anxiety and fatigue during the day. These disorders may also lead to decreased work productivity and

concentration.  Please be aware that Jennifer is being treated with medications that are currently being adjusted.").  Company policy required that she inform Wilkey of her medical diagnosis because the medications prescribed for her could interfere with her job performance.  CPC 0335.  While Khare did not respond to the physician's note, Wilkey returned the directive to Garner and told her he did not need to know such personal information.  Garner Dep. at 22.  Garner gave her managers a more detailed directive (including diagnosis of depression disorder, panic disorder and agoraphobia and her symptoms), dated February 6, 2009, received by Chevron's Occupational Health Department on February 16, 2009.  Ex. F, Ex. "1"; Garner Dep. at 8.  Her prescribed medications included Prozac for depression, Clonazepam and Hydroxyzine for anxiety, and Lisinipril and Metformin for hypertension.  Garner Dep. at 10. After consulting with Human Resources director Patsy Love ("Love"), Wilkey asked Garner to send it on to Corporate Medical for review, as she did.  Wilkey Dep. at 19-22.

On February 23, 2009 the incident with the odor seeping out of her laboratory occurred.  Garner Dep. at 28-30.  Garner states that when she called, she instructed the security guard to contact Khare.  *Id*.  Khare then contacted Garner to discuss the nature and cause of the odor.  *Id.*  Garner testified that she explained to Khare that she could not drive back to the office because she had taken her evening medication.  *Id*.  She claims that in violation of

Chevron policy (#28, Ex. B-1, CPC 0062 (Abbott's email to employees)), Khare told her to telephone the guard and tell him to go into the lab and raise the hood sashes to vent the odor. *Id.*

Chevron later investigated the incident and concluded that Garner should not have directed the guard to do what Khare had instructed. Khare and the security guard were not reprimanded over the incident even though they both also violated the policy. Wilkey Dep. at 27-30, 33; Abbott Dep. at 65-67.

Regarding the second incident with the air flow valve on April 30, 2009, Garner testified that she called the facility twice but was told by the security guard that there was no one in the facility to close it. Garner Dep. at 125-28. When she tried a third time, the security guard offered to close it. *Id.* This time, too, the security guard was not reprimanded for violating the policy. Abbott Dep. at 67-68.

On May 13, 2009, according to Garner, Debra Shoemaker, the registered nurse in Chevron's Occupational Health Department, talked with Garner because she noticed that in the Clinic Visit Progress Notes Report Garner had stated that she was getting worse with her anxiety and wanted to know how to sign up for benefits if she would be off work. Shoemaker told Garner that she should contact her Human Resources representative about FMLA, STD, and LTD, and Garner told Shoemaker that she would see her doctor next month to discuss taking time off. #28, Ex. B-1, CPC 0534.

-46-

A short time later Wilkey required Garner to provide the Chevron nurse with a list of her prescribed medications, and Garner complied.  Ex. B-1, CPC 317 and CPC 531-34.  On May 18, 2009 the company doctor, Dr. Cobham, advised Chevron that Garner "may continue to work with her current medications."  Ex. B-1, CPC 0281. CPC 0531.

During the investigation of the incidents on February 23 and April 30 that year, Khare had informed Wilkey that, unlike her usual self, Garner had exhibited a lack of attention to detail and forgetfulness.  Ex. B-1, CPC 0261.  Garner herself told Wilkey that her prescription medicines could be affecting her performance.  Ex. B-1, CPC 0327.  In May and June, 2009, as evidenced by notes, Chevron documented the following about Garner:  a. after the meeting with Wilkey and Love she appeared able to drive herself home after being told of her suspension (CPC 0325); b. she seemed lucid when told over the phone that she was being suspended for two days without pay; c. she asked how Corporate Medical could call her fit without an interview (CPC 0511); d. discussed with Garner the need for full attention to detail (CPC 0511); e. discussed with Garner her short term memory loss in apparently not being sure whether she had to sign in when she went to her office to pick up a book (discussed *infra*)(CPC 0511); f. discussed her medical issues (CPC 0511).

On May 18, 2009, Wilkey, Abbott, and Love decided that Garner

-47-

should receive a written warning (Ex. B-1, CPC 0061) and a two-day suspension without pay, effective May 19-20, 2009. Wilkey Dep. at 36-37; Abbott Dep. at 61-70; Ex. B-1, CPC 0061. That written reprimand (CPC 0061) stated, "This document serves as a final warning. Any future episodes of insubordination will result in termination of employment." This was the first written reprimand that she had received in almost twenty years of employment at Chevron.

Garner states that on Saturday, June 20, 2009 she returned to her office to pick up a book that she intended to read over the weekend. Garner Dep. at 44-45. Chevron's Work Alone Policy requires employees "working between, 7:00 p.m. and 6:00 a.m. and on weekends but NOT in laboratories need only sign in and out with the security guard. . . . Working alone in laboratories during non-business hours requires supervisor approval." Ex. B-1, CPC 0307; Garner Dep. at 44-45 and 132-36. Since she was not there to work, she was uncertain if she had to sign in. She did sign in whenever she "worked" during non-work hours, but was unsure if she needed to do so just to pick up her book. Garner Dep. at 135. She testified that the security guard, who knew her by sight (Wilkey Dep. at 44-46),[16] was on the telephone when she arrived and ignored her efforts

---

[16] Garner contends that because the security guard knew who she was and because she had to use her badge to access the parking lot and the building, there was no deception involved in this visit.

to get his attention to determine if she needed to sign in.  Garner
Dep. at 45-47.  So she went to her lab and retrieved the book, and
came back to the security desk just a few minutes later, but the
guard was still on the telephone and continued to ignore her.
Garner Dep. at 47-48.  Subsequently the guard told his supervisor
that she had failed to sign in or out.  B-1, CPC 0258.[17]  Garner
states that she had used her Chevron "badge" to access the parking
lot and the building.  Wilkey Dep. at 44-46; CPC 0041-43.

After being notified of the incident by the security guard,
Wilkey and Abbott met with Garner at approximately 1:00 p.m. on
Wednesday, June 24, 2009.  They instructed Garner to contact
Shoemaker and make an appointment with Chevron's doctor.  Garner
Dep. at 55, 113-14, 142; Wilkey Dep. at 46-47, 59-61; Abbott Dep.
at 77-86.  She was further instructed to stop all safety sensitive
laboratory work until further notice.  Garner Dep. at 54-55, 143;
Abbott Dep. at 79.  Garner reminded the two men that she had a
medical disability which impacted her memory.  Garner Dep. at 55,
136-37; Abbott Dep. at 81-86.  Garner returned to her office and

---

[17] The Court quotes CPC 0258's whole text:

On 6/20/09 at 10:58, Jennifer Garner attempted to enter
the gate by the chemical storage area without signing
in.  She then came to the front entrance and appeared
to be signing in.  She then entered Bldg. 1 until 11:02
when she appeared to be signing out.  However, after
she left I checked the sign-in she and I could not see
where she had signed in or out.  I logged her name in
for accountability purposes.

tried to call Shoemaker to schedule the doctor's appointment but Shoemaker failed to return the call.  Garner Dep. at 115.  CPC 0431-32.  Later that afternoon Abbott told Garner that he had changed his mind and that she was suspended with pay for about two days while Chevron investigated the situation.  Garner Dep. at 56-57, 113-15; Wilkey Dep. at 50; Abbott Dep. at 87-88.  Garner was told to go home and await a call.  Garner Dep. at 113-15; Wilkey Dep. at 50.

Friday, June 26, 2009 was Garner's regularly scheduled day off and she had a prescheduled appointment with her own physician that afternoon.  Garner Dep. at 57.  During that appointment she told her doctor about her memory problem and was taken off work by her doctor until her disabling condition could be resolved.  Garner Dep. at 57; Ex. B-4, Garner 000106.  Garner sent an e-mail to her supervisors notifying them that she would be away from work on medical leave because of her condition.  Garner Dep. at 151; Abbott Dep. at 99-100; Ex. B-1CPC 431-32.

On Monday, June 29, 2009 at approximately 5:30 p.m. by telephone call Abbott terminated Garner.  Abbott Dep. at 96-99; Garner Dep. at 58.  Chevron's position is that it decided on Friday, June 26, 2009 to terminate her for failing to follow its safety and security policies and procedures, in particular its policies regarding Working Alone, Fraud, Unattended Process and Drugs and Alcohol. (The Court notes that Abbot testified in his

-50-

deposition that he made the decision to terminate Garner on June 24, 2009.  #28, Ex. E at 98.)  Regarding the policy on "Fraud," Garner states in a footnote, # 28 at 15 n.2, that her alleged attempt to "deceive" the security guard was a factor in her termination.

Furthermore Chevron made the termination retroactive to Wednesday, June 24, 2009.  Abbott Dep. at 102-04; Garner Dep. at 187, CPC 0440; CPC 0044; CPC 0480-81; CPC 0495.  Subsequently Chevron denied Garner's request of FMLA leave and short-term disability benefits and appealed Garner's award of unemployment benefits.  Abbott Dep. a 106-11; CPC 0434-35; CPC 0440.  Initially Chevron paid Garner's salary through June 29, 2009, but later "clawed" back the compensation paid to her for June 25-26 and 29, 2009.  Abbott Dep. at 104-05; Garner Dep. at 181; CPC 0444-46; CPC 458; CPC 0482; CPC 0487.  Garner shows that she actually remained in Chevron's system as an active employee until at least July 13, 2009.  #28, Ex. B-1, CPC 0442.  Garner argues this evidence suggests that Chevron re-engineered her termination date to be retroactively effective before it received her formal request for FMLA leave.  Moreover that "termination" is at odds with the testimony that on June 24, 2009 she was told by Wilkey and Abbott that she was suspended for a couple of days *with pay* while Chevron investigated.

As for Garner's ADA claims, none of Chevron's original four

reasons for her termination (working alone, fraud, unattended process, and drugs and alcohol) is substantiated by the evidence. Garner conclusorily asserts Chevron's current reason, multiple violations of laboratory security and safety policies, is "without merit." She also objects to two alleged minor violations in 2008, which were not reduced to writing nor resulted in any disciplinary action against her.

The February 23, 2009 incident, resulting in Abbott's circulation of an email to others regarding contacts with security guards after regular work hours, did not result in any disciplinary measures at the time against Khare, Garner or the security guard. Furthermore Garner insists she followed company policy in informing Khare and even telling Khare that she could not drive back to the facility because she had taken her medications. She complains that only three months later was that incident mentioned and included in Garner's first-ever and final written disciplinary action dated May 18, 2009 and that only she of the three involved was disciplined.

Chevron did not require Garner to report the hours she worked and there are no time records to support Chevron's contention that it was ignorant of those hours. Garner emphasizes that since the employer's records are inadequate here, under the FLSA she needs only to produce sufficient evidence to show the amount and extent of uncompensated hours worked as a matter of just and reasonable inference. She does not need to prove exact damages. Her

recollection and estimate of the overtime hours she worked as a matter of law are presumed correct in the absence of rebuttal by Chevron.  Citing to her Declaration, she claims that she began working overtime in the latter half of 2007.  While the Company did not record the hours she worked directly, various documents in Chevron's possession, including the Badge Entry Records (Ex. 3 to her Declaration reflecting the time that she entered the building for work), sign in sheets, and her lab notebook (a sample[18] of which is submitted as sealed Ex. 1 to her Declaration, containing her notes identifying her actions at various times of the day in connection with specific experiments) evidence the overtime hours that she worked and provide ample evidence of her overtime hours, sufficient to meet her burden of proof.  She suggests that a comparison of the Badge Entry Records to the lab notebook would demonstrate the number of days that Garner worked overtime.  For example, on December 7, 2007 she entered the building at 8:02 a.m. and made her last entry in the notebook at 5:40 p.m., establishing that she worked at least fifteen minutes of overtime that day. Allowing time for Garner to clean up the lab and used equipment and complete her end-of-day routine, it is reasonable to infer that she worked thirty minutes of overtime that day.  In addition she can estimate the number of hours she worked each day based on entries

---

[18] She offers to submit a copy of the complete notebook, which is over one hundred pages, if the Court deems it necessary.

in the lab notebook by identifying which experiments required what number of hours to complete.  Her notes show that she performed experiments lasting eight hours or more at least once a month from September 2007 through June 2009.  She occasionally returned to the lab after hours on Saturdays.  Ex. B, Ex. 2, After Hours Sign In Log.  That Log shows that on at least three different days Garner worked four or more hours outside of her scheduled shifts.  *Id.* From notations of experiments conducted and time notations in the lab notebook, Garner estimates that during the last quarter of 2007 she worked an additional thirty minutes a day on the days she was scheduled to work nine hours.  Garner Decl. and Ex. 1.  During her four-day work week, Garner routinely worked two hours of overtime. On her scheduled eight-hour day, she regularly worked an hour beyond her scheduled shift.  Garner Decl.  Therefore on the alternate five-day workweek, Garner worked three hours of overtime in 2007.  *Id.*  During the remainder of her employment at Chevron, her overtime hours increased.  She claims that between January and June of 2008, she regularly worked a total of three hours of overtime during her four-day work week and four hours of overtime during her five-day work week.  Garner Decl.  Between July and December of 2008, she typically worked four hours of overtime during her four-day work week, and five hours of overtime during her five-day work week.  *Id.*  Finally from January through June 2009, she routinely worked six hours of overtime during her four-

day work week and seven hours of overtime during her five-day work week.  *Id.*  Furthermore Garner regularly emailed her supervisor at the end of her day, a communication which demonstrated that she was finishing beyond her scheduled time.  Garner Decl.  Moreover she met each morning with Khare, who understood the time requirements for her experiments and discussed the results of her work the day before, also demonstrating that she was working overtime to complete the experiments.  *Id.*  Thus undisputed evidence shows that Chevron knew or should have known that she was working overtime without compensation.  Therefore Chevron is not entitled to summary judgment on her FLSA claim.

As for Chevron's knowledge of her overtime, she emphasizes the law that an employer as a duty to enforce its rule against overtime by making sure it is not performed.  "Where a plaintiff is working after shift, the defendant 'knew and had reason to believe that the work was bing performed,' even though the plaintiff did not submit overtime forms for work" because the employer approved the work and required that it be done.  *Edmiston v. Skinny's Inc.*, No. 1:02-cv-173-C, 2003 U.S. Dist. LEXIS 16179, *16–17 (N.D. Tex. Sept. 15, 2003), *citing Karr v. City of Beaumont*, 950 F. Supp. 1317, 1324 (E.D. 1997).

Regarding her claim under the FMLA, Garner maintains that she suffered an adverse employment action based on her 2007 FMLA leave, from which she returned on September 5, 2007.  Less than four

months later, in a performance appraisal proposal her supervisor Wilkey viewed her as "downwardly mobile" and in need of improvement. CPC 0305. Furthermore Chevron was dissatisfied with the quantity of her work output in 2007 caused by her leave. Garner 000051-54, Final Comments, Supervisor Feedback. Her performance appraisals state on their face that they were used as input into decisions about pay, selection and promotions. CPC 0228. During her deposition Garner testified that based on Wilkey's comments on December 13, 2007 during her annual performance evaluation, she would have received a larger raise had she not been absent from work on the FMLA leave during 2007. Garner Dep. at 81, 83. She also testified that Wilkey's comments were a "black mark" against her because she worked only eleven months that year. He also warned her that her performance would not be successful in 2008 unless she immediately reversed the trend of declining work output. The previous year, 2006, she had received a Superior Performance rating with a notation that her performance was outstanding. CPC 0223; CPC 0226. Garner's 2005 evaluation stated that her performance was "solid." Garner 000042. The Fifth Circuit concluded in *Velma Villalon v. Del Mar College Dist.*, Civ. A. No. C-09-252, 2010 U.S. Dist. LEXIS 82766, *18 (S.D. Tex. Aug. 13, 2010), that even if a poor performance evaluation is not an adverse employment action, it can be an important precursor to an ultimate adverse action. Furthermore a

supervisor's negative reaction to use of FMLA leave may be sufficient in some circumstances to establish causation for retaliation under the FMLA. *McArdle,* 293 Fed. Appx. at 338.

The temporal proximity between Garner's leave and the retaliatory conduct supports a causal connection for her retaliation claim. *Evans v. City of Houston*, 246 F.3d 344, 354 (5th Cir. 2001)(a time lapse of up to four months was sufficient to satisfy the causal connection for prima facie case of retaliation).

Thus, Garner contends, the evidence either establishes that she is entitled to summary judgment on her FMLA retaliation claim or she has raised a genuine issue of fact for trial.

Regarding her 2009 FMLA leave request, the issue centers around the timing of her termination. Garner maintains, as summarized *supra*, that the evidence shows that she timely notified Chevron that she would seek FMLA leave weeks before her termination, i.e., that Chevron was on notice at least five weeks prior to Garner's termination, starting with Garner's telling Shoemaker on May 18, 2009 that she would be discussing at her appointment with her treating physician on June 26, 2009 that she needed FMLA leave because of her deteriorating medical condition. At that appointment her physician did decide that she should be on short-term leave and he filled out and faxed a Human Resources form entitled "Attending Physician's Statement" to the number at the bottom of the form to the medical department three days before she

was fired.  Moreover on June 29, 2009 Shoemaker forwarded Garner's email about FMLA leave to Chevron's Human Resources department (CPC 0453) at 9:20 a.m.  At 1:42 p.m. that same day Human Resources requested that Garner be terminated in the system (CPC 0453).  At 2:10 p.m. Garner was supposedly terminated in the system (CPC 0452), yet she remained in it purposes of payroll through June 29, 2009 and remained active in it with no termination date until at least July 13, 2009.  #28, Ex. B-1, CPC 0442.  At 5:30 p.m. she received a phone call from Abbott and Lisa Zurita and was told that she was fired.  The evidence establishes that, or raises genuine issues of material fact whether, Chevron discriminated against her for requesting FMLA leave.

Chevron concedes for purposes of the summary judgment motion that Garner is disabled under the ADA.  At issue are whether she was qualified for her job and whether she suffered an adverse employment decision because of her disability.  Although originally Chevron provided four reasons for her termination (working alone, fraud, unattended process, and drugs and alcohol), Garner claims that because no evidence substantiated these, Chevron now states that the only reason for her termination was multiple violations of laboratory and security safety policies, particularly the incidents on February 23, 2009, May 2, 2009, and June 20, 2009.  She claims that Chevron's defenses are pretextual.  When Garner received a written disciplinary action on May 18, 2009 for "insubordination,"

five days after discussing FMLA leave with Shoemaker, the writing did not mention any specific violation of Chevron policy but nevertheless warned that her employment was subject to termination if another incident of insubordination was reported.  The Chevron policy did not state that all employees must sign in and out regardless of their reason for entering the facility on weekends, but specifically address employees coming to "work."  She came not to work but to pick up a book she had left there, so the suspension and termination for failure to sign in and out was unwarranted. She maintains that the evidence shows that the motivating factor for her termination was discrimination based on her actual or perceived disability.  Alternatively the evidence creates a fact issue about each of Chevron's stated reasons for its actions and creates a reasonable inference that disability was a determinative factor in the adverse employment decisions.

### Chevron's Reply (#31)

Chevron objects that Plaintiff fails to present sufficient evidence to support her overtime claims and argues that rather than establishing overtime, Garner's  notebook and badge entry records actually show that she rarely came to work on time and left the building multiple times each day.  Chevron points in particular to the entries for December 12 and 13 in 2007.

Chevron further singles out Garner's statement in her 2008 Performance Evaluation (#28, Ex. B-4, also attached as Ex. C to

#31):

> Concerning start time, at the beginning of 2008 I was
> working 8:30 to 6:00.  When school was out I changed my
> work hours to 7:30 to 5:00 to enable me to leave earlier
> since it was summer.  After about one month of this
> schedule I did get permission to change it back to 8:30
> to 6:00 because I discovered the 7:30 to 5:00 schedule to
> be harder for me.  Therefore, since July 2008 I have been
> working 8:30 to 6:00.

Chevron points out that not only does Garner not mention overtime,

but even with the granted flexibility in her schedule, a review of

the badge records for August 2008 shows that out of a total of

sixteen days worked, Garner was late to work 11 times, or 68% of

the time.

Furthermore, during her deposition Garner was unable to state

how much overtime she believed that she had worked.  Now she

submits her declaration in support of her response claiming that

she worked from three to seven hours of overtime each work week.

Chevron asserts that this declaration is void of competent and

otherwise admissible evidence to preclude summary judgment.  While

asserting that different experiments took different numbers of

hours, she fails to identify even one specific experiment or one

specific date.  Her declaration statements are not consistent with

the badge records that are her proof of her overtime, as noted.

The statements are self-serving and unsupported and contrary to the

evidence in the record.  *In re Hinsley*, 201 F.3d 638, 643 (5th Cir.

2000)("A party's self-serving and unsupported claim that she lacked

the requisite intent [for fraud] is not sufficient to defeat

summary judgment where the evidence otherwise supports a finding of fraud.").

In addition, Chevron argues that Plaintiff has failed to show the elements of a *prima facie* case under the FMLA and therefor her FMLA discrimination and retaliation claims must be dismissed. She does not identify an adverse employment action suffered as a result of her 2007 leave. Garner received a "Fully Successful" rating on her 2007 Performance Evaluation after a higher "Superior Performance" rating on her 2006 Performance Evaluation, but she still received the same raise both years. Garner Dep. at 73. While she concedes that a poor performance evaluation is not an adverse employment, she argues that it can be an important precursor to an ultimate adverse action. Not only did Garner not receive a poor evaluation, but she does not allege a later adverse employment action. In *Villalon*, 2010 U.S. LEXIS 82766, the case she relies on, the facts are easily distinguishable. In *Villalon*, the plaintiff took FMLA leave on March 26, 2008, was given a poor performance evaluation less than three weeks later, and was terminated less that four months after taking leave. In contrast, Plaintiff took FMLA leave in August 2007, received a "Fully Successful" Performance Evaluation in early 2008 for 2007, and received a pay raise commensurate with that she received for 2006.

As for the third prong of her *prima facie* case, she fails to produce evidence showing that other employees who did not request

FMLA leave were treated more favorably than she or that she was terminated because of her request for leave under the FMLA. Chevron does not dispute that Garner faxed her request for leave to Chevron's medical office on Friday, June 26, 2009, but insists that Abbott made the decision to terminate her on Wednesday, July 24, 2009, two days earlier and five days before Abbott learned of her request.

In the context of an employee's termination for violation of a company policy, in discrimination cases the issue is whether the employer reasonably believed in good faith that the violation occurred. *Waggoner v. City of Garland*, 987 F.2d 1160, 1165-66 (5th Cir. 1993)("[T]he inquiry is limited to whether the employer believed the allegation in good faith and whether the decision to discharge the employee was based on that belief.").   Therefore Garner's denial that she is innocent of the policy violations is irrelevant, argues Chevron, citing *id*.   Instead the mind set of Abbott when he made the termination decision controls.

### Plaintiff's Surreply (#33)

Garner initially notes that Chevron denied her access to her lab notebook until August 26, 2011, a date after she was deposed and after Chevron filed its motion for summary judgment.   Garner argues that Chevron incorrectly suggests that her work hours were limited to the time recorded in her lab notebook.   As indicated in her Declaration, the lab notebook reflects only her experiments.

-62-

At the end of each day she cleaned the lab and used equipment, emailed Khare, and logged off the computer, time not reflected in the notebook; thus the last time entry in the lab notebook does not reflect the time that she left work.  Chevron cannot produce the emails generated at the end of her day, so the notebook and badge entry records are the best evidence available of her hours worked. Moreover Garner points out that Chevron fails to address any of the dates other than December 12, 2007 identified by Garner in her response to demonstrate her overtime hours, and those remain undisputed.  Garner further explains that the badge entry records show she went in an out of the building during the day because part of her job duties, pursuant to instructions from Khare, was delivering catalyst samples to another building on the site.

Garner emphasizes that under the law, since Chevron failed to keep adequate records, she should not be penalized for imprecise evidence of her overtime hours and entitled to just and reasonable inferences to be drawn from that evidence.  *Colindres v. QuietFlex Mfg.*, 427 F. Supp. 2d 737, (S.D. Tex. 2006)(When the employer's records are inadequate or inaccurate, the employee may meet his burden "if he proves that he has in fact performed work for which he was improperly compensated and if he produced sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference.  If the employee meets his burden, the 'burden shifts to the employer to come forward with evidence of

the precise amount of work performed or with evidence to negate the reasonableness of the inference to be drawn from the employee's evidence.  If the employer fails to produce such evidence, the court may then award damages to the employee even though the result may only be approximate.'"), *citing Anderson v, Mount Clemens Pottery Co.*, 328 U.S. 680, 687-88 (1946), and *Harville*, 433 F.3d at 441.

Garner insists that she suffered an adverse employment action after her 2007 FMLA leave because the merit raise in her annual salary that she received for 2007 was 2.26% less than the increase she had received in 2006. #33, Ex. B, 000075-77. *Evans v. City of Houston*, 246 F.3d at 354 (temporal proximity between Garner's leave and the retaliatory conduct supports a causal connection for retaliation claim).  Moreover, after her performance review, she became concerned that if she took further FMLA leave she would suffer further adversity in employment, so she used her accrued vacation paid time off rather than accrued sick leave or FMLA leave when she needed time off because of her illness.

Although Chevron contends that Abbott made the decision to terminate Garner two days before she requested FMLA leave in 2009 and five days before he learned of that request, it has no documentary evidence to support these claims.  The only evidence that Abbott conferred with "his boss and others" is his own deposition testimony; there is no other evidence that such a

conference occurred, including from Dr. Mary Jane Hagenson, whom Abbott identified as one of the persons he conferred with and a person instrumental in the decision to terminate.

She further contends that she has raised issues of material fact relating to Abbott's "mind set" and whether he acted in "good faith."

Moreover she reiterates the evidence raising fact issues about the timing of her termination.

### Court's Decision

Keeping in mind that the Court must consider all evidence and draw all inferences from the factual record in the light most favorable to the nonmovant, the Court concludes the following regarding Garner's claims under the three statutes.

**FLSA**

Chevron did not keep adequate records of its employees' overtime nor make a substantial effort to ensure that they were not working overtime, so the Court agrees that Garner's burden of proof was substantially lessened.

Nevertheless, the Achilles' heel in Garner's FLSA claim is her failure to produce any evidence demonstrating that Chevron, i.e., her supervisor Wilkes or anyone above him) had actual or constructive knowledge that Garner was allegedly working overtime. *Friewalde*, 339 Fed. Appx. at 455; *Forrester*, 646 F.2d at 414; *Newton*, 47 F.3dd at 748. She knew that Chevron did not require

that she sign time sheets and she fails to show that she ever complained about or reported overtime hours to Chevron.  She does not explain, no less demonstrate, why she never requested overtime compensation until after she was fired, despite the statute of limitations.[19]

Nor does Garner support her retaliation claim under the FSLA. 29 U.S.C. § 215(a)(3), because she presents no evidence that she complained about, instituted or caused to be instituted any proceeding based on Chevron's failure to pay overtime compensation that led to her termination.

Thus Chevron is entitled to summary judgment on Garner's FLSA claim.

**FMLA**

Her FMLA claims against Chevron are for retaliation and for interfering with, restraining or denying her exercise of her rights under the FMLA.   To make a *prima facie* case for interference with a plaintiff's FMLA rights, a plaintiff must demonstrate that she was entitled to the benefit, i.e., that she suffered from a "serious medical condition that prevented her from working" so that

---

[19] The statute of limitations on FLSA claims is two years unless the violation is willful, in which case it is for three years from the violation.  Garner fails to produce any evidence demonstrating that Chevron willfully failed to pay her earned overtime compensation.  *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133 (1988).   Thus Garner's claim, even if viable, would only go back two years before she filed this action on January 15, 2010, or to January 15, 2008.

her leave is protected under the statute, and that the benefit was denied. *Ford-Evans v. United Space Alliance LLC*, 329 Fed. Appx. 519, 523 (5th Cir. May 14, 2009). To make a *prima facie* case of retaliation under the FMLA, the plaintiff must demonstrate that (1) she was protected under the FMLA, (2) she suffered an adverse employment action, and (3) she was treated less favorably than an employee who had not requested leave *or* that the adverse decision was made because he sought protection under the FMLA. *Mauder*, 446 F.3d at 583; *Wilson v. Noble Drilling Services, Inc.*, 405 Fed. Appx. at 912.

The Court finds that not only has Garner established a *prima facie* case for retaliation and interference, but she has raised genuine issues of material fact that Chevron's articulated reasons for its adverse employment actions were a pretext for discrimination based on her seeking medical leave for necessary treatment under the FMLA.

No one disputes that Garner was protected under the statute because her medical condition entitled her to FMLA leave. Her long record of high ratings at Chevron establishes that she is qualified for her job.

Although Garner originally alleged that, after her 2007 leave, as retaliation she was not given as large a raise as in past years, she conceded after some discovery and during her deposition that the amount of the claim was not accurate. #28, Ex. C at 73, 74-75.

-67-

Now she argues that the increase in her 2007 merit pay was 2.26 per cent less than that of her previous bonus in 2006 and constituted an adverse employment action.  #33, Ex. B, 000075-77.  Given her annual salary of $57,285, *id.*, that reduction meant that she would earn $1294.64 less before taxes that year than she would have under the previous 5.5% raise; moreover it would continue to affect all her future percentage increases, too.  She further claims that in June 2009 she was terminated because Chevron learned that she was seeking another extended leave because of her medical condition.

To determine when a decision is an "adverse employment decision" for retaliation claims under the FMLA, the Fifth Circuit has applied the test for retaliation claims under Title VII established in *Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53, 68 (2006):  an employee suffers an adverse employment action if "a reasonable employee would have found the challenged action materially adverse, which in this context means it might have dissuaded a reasonable worker from making or supporting a charge of discrimination."  *McArdle v. Dell Products, L.P.*, 293 Fed. Appx. 331, 337 (5th Cir. Sept. 22, 2008); *in accord, Breneisen v. Motorola, Inc.*, 512 F.3d 972, 979 (7th Cir. 2008).  "Whether a reasonable employee would view the challenged action as materially adverse involves questions of fact generally left for a jury to decide."  *Id., citing Burlington*, 548 U.S. at 71-73, and *Crawford v. Carroll*, 529 F.3d 961, 973 n.13 (11th Cir. 2008)("*Burlington* also

-68-

strongly suggests that it is for a jury to decide whether anything more than the most petty and trivial actions against an employee should be considered 'materially adverse' to him and thus constitute adverse employment actions."). Thus whether the reduction in Garner's bonus percentage constituted an adverse action is for the jury to decide.

Garner relies in part on temporal proximity between her August 2007 medical leave and the alleged retaliatory conduct, i.e., the reduction in her merit pay increase,[20] to support a causal connection. *Evans v. City of Houston*, 246 F.3d at 354. She further points to her supervisor Wiley's email to Paul Aegerter on December 13, 2007 proposing to rate Garner as "downwardly mobile" and "needs improvement" and asking for a conference. She also testified during her deposition about Wilkey's remark in March 2008 that she was not getting a "good" raise because she had not completed as much work in the eleven months that she worked as she would have if she had worked all twelve, as direct proof of retaliatory animus. *See McArdle*, 293 Fed. Appx. at 338, *citing Hodgens v. General Dynamics Corp.*, 144 F.3d 151 (1st Cir. 1998)(supervisor's warnings that employee "was taking 'too much time off'" and expressions of concern about his absenteeism were sufficient to show causation in an FMLA retaliation case). An

---

[20] A merit pay increase can be an adverse employment action under the FMLA. *McArdle*, 293 Fed. Appx. at 334-35.

email from Garner to Khare, her direct and immediate supervisor, about the rating suggests that Wilkey's view was ill founded:

> Gyanesh
> Concerning the meeting that John [Wilkey] as set up for Thursday, I apologize for all this; I didn't intend to cause such a furor. When John told me in the PMP meeting of my productivity issue in the latter half of 2007, my only thought was to meet with you to find out the specifics of how or why I wasn't meeting your expectations so that I could correct the problem. And you told me you were not of that opinion after all, so I approached John so he could correct the comments on my form, and it has started a ball rolling. But if you ARE of the opinion that my productivity was low during that time, just let me know and I will definitely take steps to correct the problem.

#28, Ex. B-1, CPC 0208. In light of this email, the Court observes that during his deposition Wilkey was asked to describe Khare's roll in terms of his responsibilities regarding Garner. #28, Ex. D at 56. Wilkey conceded that Khare liked her very much and had worked with her for years, but that Khare was not consulted about any of the disciplinary actions taken relating to Garner even though Khare was her most direct supervisor in a daily basis. *Id*. Furthermore Garner testified that she was afraid to take FMLA leave, and the documentary evidence supports her claim that she instead used her vacation and sick days when her medical condition made it necessary to take off from work.

As for her FMLA entitlement and retaliatory termination claims, Garner has raised substantial questions of material fact for trial regarding Chevron's articulated reason for her dismissal with respect to the timing of her request for leave, notice to

Chevron, the questionable importance of her alleged policy violations on their own facts and in view of a twenty-year career free of reprimands, the unequal treatment of others involved in the violations, the single warning before her termination that she would be terminated on the next violation, and evidence suggesting that Chevron manipulated the retroactive date of her termination, as discussed *supra*.  *See, e.g., Dehart v. Baker Hughes Oilfield Operations, Inc.*, 214 Fed. Appx. 437, 443 (5th Cir. Jan. 19, 2007), *citing Shirley v. Chrysler First, Inc.*, 970 F.2d 39, 44 (5th Cir. 1992), in which the Fifth Circuit found causation despite a fourteen-month gap between the protected activity and the employer's adverse action because "the employee had worked for nine years without a single oral or written reprimand until she filed an EEOC charge, at which point the employer 'suddenly found three so-called flagrant indiscretions or violations, which it accused this plaintiff of committing.'"

The Court disagrees with Chevron's contention that Plaintiff is denying that she violated Chevron policies.  She asserts that they were not the actual reason for her dismissal, but were a pretext for discrimination based on her assertion of her right to medical leave under the FMLA and on her disability under the ADA based on a number of circumstances discussed.  Garner raises questions about the seriousness of her infractions, which received attention only after she indicated she was having increased medical

problems and might request medical leave.  For example, regarding the February 2009 event triggered by an odor emanating from her laboratory into the hallway, she received no discipline and no written disciplinary record about it until it was noted for the first time after the April/May event when she was suddenly given a "final warning"; Garner followed her supervisor's instructions about calling the security guard, yet neither he nor the security guard was ever disciplined; nor was Khare, who knew more than anyone else about the security guard's infractions and the hours she worked, interviewed about any of those violations (Wilkey Dep., #28, Ex. D at 56, 69).

The Court finds that Chevron's motion for summary judgment should be denied as to the FMLA claims.

**ADA**

Garner complains that she was not given reasonable accommodations for her disability.  Under the law of this Circuit, "'[a]n employee who needs an accommodation because of a disability has the responsibility of informing her employer.'"  *Rommel E. Griffin, Sr. v. United Parcel Service, Inc.*, ___ F.3d ___, No. 10-30854, 2011 WL 4978582 (5th Cir. Oct. 19, 2011), *quoting EEOC v. Chevron Phillips Chem. Co.*, 570 F.3d 606, 621 (5th Cir. 2009).  Garner testified that although she gave Chevron notice of her diagnoses, symptoms and medications, she did not ask for any accommodations, but thought "if they believed that I needed certain

-72-

accommodations . . . they would come to me and say so." Garner Dep. #17, Ex. A at 18. She states that she did not ask for certain accommodations because "I wasn't sure if . . . accommodations would help me or not or if I needed any. That's why, as I said, I was waiting for . . . my superiors to make that decision." *Id.* at 18-19. Garner bears the burden of requesting specific reasonable accommodations under the ADA, so Chevron is entitled to summary judgment on the reasonable accommodations issue.

As for Plaintiff's discrimination claims under the ADA and ADAAA, Chevron has stated that for purposes of the summary judgment motion it does not dispute that Plaintiff has a disability. Moreover Garner has presented evidence, uncontroverted for purposes of the motion for summary judgment, that she has an impairment that substantially limits a major life activity, as well as has a record of impairment and was regarded by Chevron as having an impairment.

Garner has established a *prima facie* case of discrimination under the ADA, i.e., that (1) she is disabled, has a record of having a disability, or is viewed as disabled; (2) she is a qualified individual; (3) she was subjected to an adverse employment action on account of her disability; and (4) she was replaced by, or treated less favorably than, non-disabled employees. *Zenor v. El Paso Healthcare System. Ltd.*, 176 F.3d 847,(5th Cir. 1999); *Gowesky v. Singing River Hosp. Sys.*, 321 F.3d 503, 511 (5th Cir. 2003).

Based on the same facts that sustain her FMLA claim, the Court finds for the same reasons her ADA claims survive summary judgment for trial.   She has provided evidence that she is a "qualified individual with a disability," who was subjected to an adverse employment action because of her medical disability.   She shows that others involved in the same policy infractions as she but who were not disable, i.e., Khare and the individual security guards, and who were not subjected to the same disciplinary sanctions as she was.

Accordingly, for reasons stated above, the Court ORDERS that

1.   Plaintiff's motion for leave to file surreply (#32) is GRANTED;

2.   Chevron's motion for summary judgment (#17) is GRANTED as to Plaintiff's FLSA claim and her claim for denial of reasonable accommodations under the ADA;  but

3.   Chevron's motion for summary judgment is otherwise DENIED.

**SIGNED** at Houston, Texas, this  29th  day of  November , 2011.

_____
MELINDA HARMON
UNITED STATES DISTRICT JUDGE

-74-